IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| United States of America, ) | |
| ) | |
| v. ) | Criminal No.: 2:09-992-PMD |
| ) | |
| Richard Narrl ) | |
| a/k/a Noel H. Richard, ) | |
| a/k/a Richard Earl, ) | |
| ) | **ORDER** |
| Defendant. ) | |
| _____) | |

This matter is before the court upon Defendant Narrl Richard's[1] ("Defendant") motion to suppress a quantity of heroin seized by the City of North Charleston Police Department. Defendant is charged in a one count indictment for knowingly, intentionally and unlawfully possessing with intent to distribute a quantity of heroin, a Schedule I controlled substance; In violation of Title 21 United States Code sections 841(a)(1) and 841(b)(1)(c).

**PROCEDURAL HISTORY**

Defendant was indicted on September 8, 2009 for knowingly, intentionally and unlawfully possessing with intent to distribute a quantity of heroin, in violation of 21 U.S.C. sections 841(a)(1) and (b)(1)(C). Defendant has pled not guilty. Defendant filed a motion to suppress on February 1, 2010. In this motion to suppress, Defendant argued that the traffic stop and subsequent search of the vehicle was in violation his Fourth Amendment rights. After a hearing on the motion to suppress, the court denied the motion.

Subsequently, Defendant filed a petition under 28 U.S.C. section 2241 asserting that he should be released from custody prior to trial. In his petition, he argued that the vehicle search was invalid and all evidence recovered should be suppressed, the search warrant obtained by

---

[1] Defendant's name is Narrl Richard. Mr. Richard is referred to in the indictment as Richard Narrl a/k/a Noel H. Richard a/k/a Richard Earl, but his correct name is Narrl Richard.

1

police for his residence was invalid due to lack of probable cause, the search warrant was otherwise defective, and the government had not obtained a court order necessary for electronic surveillance. The court dismissed his petition on March 7, 2011 because this criminal case was still pending and it "[i]t is well settled that in the absence of exceptional circumstances in criminal cases the regular judicial procedure should be followed and habeas corpus should not be granted in advance of trial." *Jones v. Perkins*, 245 U.S. 390, 391-92 (1918).

Defendant, by and through his new counsel, has filed a subsequent motion to suppress challenging the government's use of a GPS tracking device as part of the investigation that led to Defendant's arrest.

## **FACTUAL BACKGROUND**

In the spring of 2009, the narcotics unit for the North Charleston Police Department received information that Defendant was involved in the distribution of heroin. As a result, they began to do surveillance at 7898 Dove Creek Road, Apartment # 106 in North Charleston. During the surveillance, the officers observed Defendant come in and out of the apartment and get into a white 2004 Pontiac Grand Prix, bearing a Florida license tag numbered 765-IGF and registered to a Darlen Saget. Then, on May 6, 2009, Detective Jason Roy placed a GPS tracking device underneath the rear bumper of the Pontiac, while the vehicle was parked in a public place. The type of tracking device that Detective Roy employed allowed him to monitor the vehicle's movement from a laptop computer. From his laptop, Detective Roy observed that from May 6 to May 30, 2009 the car hardly moved.

Then, on May 31, 2009, at approximately 9:00 a.m., Detective Roy noticed the Pontiac was traveling through Virginia, and a review of the vehicle's travel history indicated that it had left North Charleston at approximately 1:33 a.m. and had stopped several times for a few

minutes at areas next to the interstate. He continued to monitor the vehicle's movement from his laptop, and eventually, the vehicle arrived in Newark, New Jersey at approximately 2:30 p.m. Then approximately 1 hour and 20 minutes later, at 3:49 p.m., the vehicle departed New Jersey travelling on I-95 south. It travelled through Delaware, Maryland, Virginia, North Carolina, and then back into South Carolina. Again, the vehicle stopped several times for only a few minutes at locations near the interstate. The vehicle entered South Carolina on I-95 at approximately 2:30 a.m. on June 1, and it merged onto I-26 towards Charleston at 4:30 a.m.

Based on the travel route of the vehicle, officers set up surveillance along I-26, and as the vehicle approached the Ashley Phosphate Road exit, it moved into the exit lane without signaling. Detective Dan Bailey and Detective Matt Hughes then initiated a traffic stop on the exit ramp. Detective Bailey approached the passenger side of the vehicle and observed the passenger, later identified as the Defendant, to be very nervous. He was sweating and his arms and legs were shaking. Detective Bailey asked Defendant if he was okay, and he indicated he was. When Defendant was asked for identification and his name, Defendant allegedly turned to the officer, opened his mouth and acted as if he were speaking, but nothing came out. Finally, Detective Bailey asked Defendant for his date of birth and his age, and the Defendant responded that he was 27 years old and was born in 1976. Based upon the information about the vehicle's route of travel, Defendant's nervous behavior, and the incorrect information he provided about his age and birth year, the officers asked Defendant to step out of the vehicle. The driver of the vehicle, Katia Coney, was also asked to step out of the vehicle.

While out of the vehicle, Defendant told the officers that he and his girlfriend were returning from a weekend trip to New Jersey and that they had been there for two days. Ms. Coney, however, told the officers that they had only stayed in New Jersey for about an hour,

which was consistent with the movement of the vehicle traced by the GPS device. Also while both occupants were out of the vehicle, Canine Officer Anthony Daniele, who was already at the scene, deployed his canine dog to conduct a perimeter sniff of the vehicle for the odor of illegal narcotics. The drug dog positively alerted to the exterior driver's side door, the center console, and to the rear passenger floorboards.

By this time, Detective Daniel Prichard arrived at the scene, and he was advised of the drug dog's positive alert on the vehicle, as well as the conflicting stories given by Ms. Coney and Defendant. Detective Prichard then searched the passenger compartment of the vehicle, and he observed that the passenger's side rocker panel was loose. As a result, he pulled it out, reached under the carpet and padding, and removed five glassine bags with a light brown powder held together with rubber bands. The substance field-tested positive for heroin, and Defendant and Ms. Coney were arrested for possession with the intent to distribute heroin and for possession with intent to distribute heroin within ½ mile of a school or park.

The officers then obtained a search warrant to search the vehicle, and during the search, the officers found a false compartment under the center console, which was operated by a hydraulic piston. In the center console, the officers found a Haitian passport, which was issued to the name Narrl Joseph Richard and had Defendant's picture on it, a plastic bag containing 1,000 glassine bags containing a light brown powder, which field-tested positive for heroin, as well as other items. The officers then obtained and executed a search warrant at Apartment # 106 located at 7898 Dove Creek Road in North Charleston, and inside one of the bedrooms, the officers found documents bearing the name of Narrl Richard and Darlen Saget.

## ANALYSIS

Defendant argues that the use of the mobile tracking device constituted an unreasonable search in violation of his Fourth Amendment rights. The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV. *Katz v. United States*, 389 U.S. 347 (1967) is the starting point, in determining whether the government's actions have violated a person's Fourth Amendment rights. In that case, the Court held that wiretapping of a public telephone in a phone booth "constituted a 'search and seizure' within the meaning of the Fourth Amendment," because a person would justifiably believe that they were having a private conversation in that situation. *Id.* at 351-353. (rejecting the argument that a "search" can occur only when there has been a "physical intrusion" into a "constitutionally protected area," and noting that the Fourth Amendment "protects people, not places"). Consistent with the holding in *Katz*, the Court has "uniformly [] held that the application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." *Smith v. Maryland*, 442 U.S. 735 (1979).

Working within this Fourth Amendment framework, the Court addressed the issue of tracking devices in *United States v. Knotts*, 460 U.S. 276 (1983). In that case, law enforcement began visual surveillance of Tristan Armstrong because Hawkins Chemical Company claimed Armstrong had begun buying suspicious amounts of chemicals, similar to those he was accused of stealing from 3M while working there. *Id.* at 278. After some visual surveillance, law

enforcement noticed that after purchasing the chemicals, Armstrong delivered them to Darryl Petschen. *Id.* Based on this information, officers obtained consent of Hawkins Chemical Company to place a tracking device in a five gallon container of chloroform. *Id.* Officers did not obtain a warrant authorizing the use of the tracking device. *Id.* The next time Armstrong purchased chloroform, Hawkins employees gave him the container with the tracking device. *Id.* Officers followed Armstrong to Petschen's house where the container was transferred into another vehicle. *Id.* Next they attempted to follow Petschen, but he began making evasive maneuvers so they ended visual surveillance, opting to rely on the tracking device. *Id.* The officers lost the signal for about an hour, but they were able to pick up the signal from a monitoring device on a helicopter, the signal showed that the container was stationary at a cabin near Shell Lake, Wisconsin. *Id.* Relying on the tracking device's indication that the chloroform was at this cabin and three days of intermittent visual surveillance of the cabin, police obtained a search warrant, searched the cabin, uncovered contraband, and arrested those involved. *Id.* at 279.

On appeal, the Court held that the use of the tracking device did not violate the defendants' Fourth Amendment rights, because it did not "invade any legitimate expectation of privacy," so "there was neither a 'search' nor a 'seizure' within contemplation of the Fourth Amendment." *Id.* at 285. The Court reasoned that "[t]he governmental surveillance conducted by means of the beeper in this case amounted principally to the following of an automobile on public streets and highways" and "[a] person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." *Id.* at 281-82 (When a person travels "over public streets he voluntarily convey[s] to anyone who want[s] to look the fact that that he [is] travelling over particular roads in a particular direction,

6

the fact of whatever stops he [makes], and the fact of his final destination when he exit[s] from public roads onto private property").

The Court in *Knotts* did not address whether a constitutional violation would have occurred if the beeper was used to track the chemical inside of the cabin. In *United States v. Karo*, 468 U.S. 705 (1984), the Court had occasion to address that issue and held that "the monitoring of a beeper in a private residence, a location not open to visual surveillance, violated the Fourth Amendment rights of those who have a justifiable interest in the privacy of the residence." *Id.* at 714. The primary distinction between the two cases is that the beeper in *Knotts* "told the authorities nothing about the interior of Knotts' cabin" and "[t]he information obtained . . . was voluntarily conveyed to anyone who wanted to look," but the monitoring in *Karo* "indicated that the beeper was inside the house, a fact that could not have been visually verified." *Id.* at 715 (internal quotation marks omitted).

This case is similar to *Knotts*. In this case and in *Knotts* the tracking device was utilized without a warrant, the device was only used to tell officers the vehicle's location and movements on public roads, and the device was not used to show anything about which the Defendant had a reasonable expectation of privacy. However, this case is not identical to *Knotts*. For example, in *Knotts*, the tracking device was put inside a container that was placed in a vehicle; while in this case, the tracking device was attached directly to the vehicle. This difference does not affect the result. *See United States v. Walker*, 2011 WL 651414, *4 (W.D. Mich. Feb. 11, 2011) (stating that "[t]he rationale of *Knotts* would be little altered if the beeper had been placed on the defendant's vehicle rather than in a drum of chloroform which the officers arranged to sell to the defendant"). In fact, the holding in *Knotts* is based on the fact that the beeper was not used to track anything other than movements on public roadways, a result virtually assured when the

7

device is attached directly to the car and the car remains on public roadways.

Additionally, in *Knotts* the police attempted to maintain visual surveillance and only lost sight of the vehicle they were tracking for roughly an hour, while in this case the officers did not attempt visual surveillance, but rather relied upon the tracking device to show the path of the car for a 27-day period. In other words, *Knotts* considered the use of a tracking device that was technologically more primitive than a GPS device. That case involved a device that law enforcement could use to determine a vehicle's movements as long as they remained close to the vehicle while monitoring the tracking device. A GPS device allows law enforcement to track a vehicle's moments over long periods of time from a computer located anywhere.

"[T]he Supreme Court has not yet considered whether GPS monitoring of a vehicle's location constitutes a Fourth Amendment search, but several circuit courts have and are split on the issue." *Walker*, 2011 WL 651414 at *2. Specifically, the Court of Appeals for the D.C. Circuit recently held "that prolonged GPS monitoring—24 hours a day for four weeks—was a Fourth Amendment search and was unreasonable without a warrant." *Id.* (citing *United States v. Maynard*, 615 F.3d 544 (D.C. Cir. 2010)). "It appears, however, that the great weight of the law from other federal circuits rejects [that] view." *Id.* at *2-3 (citing *United States v. Garcia*, 474 F.3d 994 (7th Cir. 2007) (holding that GPS tracking is not a search); *United States v. Pineda–Moreno*, 591 F.3d 1212, 1217 (9th Cir. 2010) ("We conclude that the police did not conduct an impermissible search of [defendant's] car by monitoring its location with mobile tracking devices."), *reh 'g en banc denied* 617 F.3d 1120 (9th Cir. 2010); see also *United States v. Sparks*, No. 10–10067, 2010 U.S. Dist. LEXIS 120257, at *34 (D. Mass. Nov. 10, 2010) ("[N]o warrant or other court order is necessary to install or monitor the GPS."); *Morton v. Nassau County Police Dep't*, No. 05–CV–4000, 2007 U.S. Dist. LEXIS 87558, at *10, 2007 WL 4264569

8

(E.D.N.Y. Nov. 27, 2007) ("[T]he use of the GPS Device was not an unreasonable search or seizure in violation of the Fourth Amendment."); *United States v. Jesus–Nunez*, No. 1:10–CR–00017, 2010 U.S. Dist. LEXIS 76107, at *12 (M.D. Pa. July 27, 2010) ("[T]here was no Fourth Amendment search or seizure by the Government's use of the GPS device."); *United States v. Williams*, 650 F.Supp.2d 633, 668 (W.D. Ky. 2009) ("[T]he Court is comfortable in concluding that no search warrant or other court order was required to permit the officers to lawfully attach the electronic tracking devices to the exterior of [defendants'] automobiles."); *United States v. Burton*, 698 F.Supp.2d 1303, 1307 (N.D. Fla. 2010) ("There is no Fourth Amendment violation for using a tracking device . . . where the substitute is for an activity, namely following a car on a public street, that is unequivocally not a search within the meaning of the amendment." (internal quotation marks omitted))).

The courts that have held that the use of a GPS tracking device does not constitute an unreasonable search "have generally recognized [*Knotts*], as controlling." *Id.* For example, in *Pineda-Moreno*, the court found that *Knotts* was controlling as to the use of a tracking device over long periods of time. 591 F.3d at 1217. In that case, law enforcement "repeatedly monitored Pineda-Moreno's Jeep using various types of mobile tracking devices." *Id.* at 1213. Over the course of four-months, officers installed these devices on seven different occasions. *Id.* The court held that the use of these devices over that period of time was permissible because "[t]he only information that agents obtained from the tracking devices was a log of the locations where Pineda-Moreno's car travelled, information the agents could have obtained by following the car." *Id.* at 1216 ("Insofar as [Pineda-Moreno's] complaint appears to be simply that scientific devices such as the [tracking devices] enabled the police to be more effective in detecting crime, it simply has no constitutional foundation. We have never equated police

9

efficiency with unconstitutionality and decline to do so now," quoting *Knotts*, 460 U.S. at 284).

Only one court has found that *Knotts* is distinguishable and held that prolonged monitoring of a vehicle's movements is a violation of a person's Fourth Amendment rights. *See United States v. Maynard*, 615 F.3d 544 (D.C. Cir. 2010), *cert denied* 131 S.Ct. 671 (2010). In *Maynard*, the D.C. Circuit Court of Appeals addressed whether the police may attach a GPS device to a car suspected of drug activity and track its movements for a prolonged period of time. *Id.* The court found that *Knotts* was not controlling as to protracted monitoring. *Id* at 556. (finding that the Court in *Knotts* left the issue of protracted monitoring open by stating "if such dragnet-type law enforcement practices as respondent envisions should eventually occur, there will be time enough then to determine whether different constitutional principles may be applicable," quoting *Knotts*, 460 U.S. at 283-84). After distinguishing *Knotts*, the court held that using the tracking device 24 hours a day for 28 straight days amounted to a warrantless search in violation of the defendant's Fourth Amendment rights. *Id.* at 564. Specifically the court stated that:

> Application of the test in *Katz* and its sequellae to the facts of this case can lead to only one conclusion: Society recognizes [the defendant's] expectation of privacy in his movements over the course of a month as reasonable, and the use of the GPS device to monitor those movements defeated that reasonable expectation.

*Id.*

Much of the reasoning in *Maynard* is attractive. For example, in distinguishing *Knotts,* the court explained that protracted GPS monitoring of a vehicle's movements from a computer provides law enforcement with vast amounts of information about a person's life, by showing law enforcement all of that person's movements over a long period of time. In contrast, the tracking device in *Knotts* was less intrusive as it was only useful as an aid to visual surveillance,

10

because law enforcement needed to remain close by in order to receive the signal from the device. In other words, the idea of police attaching a tracking device to a person's car, without a warrant, and monitoring that person's movements for an extended period of time is more unsettling than the situation in *Knotts* where a tracking device is used as an aid to short term visual surveillance.

In addition to the concerns expressed by the *Maynard* court, law enforcement in this case could have gotten a warrant pursuant to S.C. Code Ann. section 17-30-140. That statute provides that "[t]he Attorney General or any solicitor may make application to a judge of competent jurisdiction for an order authorizing or approving the installation and use of a mobile tracking device . . . ." If the application includes certain information about why the tracking device is necessary, and probable cause exists, then the judge "must enter an ex parte order authorizing the installation and use of a mobile tracking device." *Id.* While that statute did not require law enforcement to obtain a warrant before employing the GPS tracking device, it did provide a mechanism for them to obtain a warrant. The better practice in this case would have been to obtain a warrant.

However, even though this case presents a difficult decision, *Knotts* is clear that the use of a tracking device to track a person's movements on public roads is not a violation of that person's Fourth Amendment rights. *Knotts* was not limited to any particular technology and the tracking device in this case was only used to observe the vehicle's movement on public roads. Therefore, no search in violation of the Fourth Amendment occurred.

## **CONCLUSION**

For the reasons discussed above, Defendant's motion to suppress the quantity of heroin is

**DENIED.**

**AND IT IS SO ORDERED.**

PATRICK MICHAEL DUFFY
United States District Judge

**April 27, 2011**
**Charleston, SC**

12